## MASSACHUSETTS BONDING & INS. CO. et al. v. DAVIS, Agent, etc.
### (No. 1227.)

(Court of Civil Appeals of Texas. Beaumont. May 2, 1925. Rehearing Denied June 10, 1925.)

1. **Damages ☞153—Petition, in suit for breach of construction contract, held subject to special exception for failure to set out itemized statement.**

Petition, in suit by federal Agent in charge of railroads against contractor and its sureties, for breach of contract in failing to complete construction contract, *held* subject to special exception, in view of Rev. St. art. 1827, for failure to set out an itemized statement, item by item, of all work done by plaintiff in completing contract.

2. **Damages ☞153—Petition, in suit by federal Agent in charge of railroads for breach of contract, held insufficient.**

Petition, in suit by federal Agent in charge of railroads against contractor and its sureties, for breach of contract in failing to' complete construction contract, *held* insufficient, in view of Rev. St. art. 1827, where allegations did not advise defendant of how work was done in completing contract.

3. **Damages ☞153—Petition, in suit by federal Agent in charge of railroads for breach of contract, held defective for failure to allege that work was completed according to contracts.**

Petition, in suit by federal Agent, in charge of railroads against contractor and its sureties, for breach of contract in failing to complete construction contract, *held* fatally defective, in view of Rev. St. art. 1827, where it failed to show that work was completed by plaintiff according to plans and specifications under which defendants had agreed to do the work.

4. **Damages ☞153—Petition, in suit by federal Agent in charge of railroads for breach of contract, held subject to special exception for failure to set out itemized statement.**

Petition, in suit by federal Agent in charge of railroads against contractor and its sureties, for breach of contract in failing to complete construction contract, *held* subject to special exception, in view of Rev. St. art. 1827, for failure to show scale of wages paid by plaintiff in completing work for labor. or utensils used, or reasonable market ·value of material used, or market price of labor employed.

5. **Contracts ☞323(1)—Whether contractors let federal Agent take over completion of contracts because of impossible conditions being in dispute, direction of verdict improper.**

In suit by federal Agent in charge of railroads' against contractor and sureties, for breach of contract in failing to complete construction work, where evidence was conflicting as to whether defendants let plaintiff take over completion of contract because plaintiff imposed impossible conditions, it was error to instruct a verdict for plaintiff.

6. **Damages ☞121—Federal Agent not entitled to recover ·difference between contract price for construction of railroad and actual cost of completing work.**

Federal Agent in charge of railroads, completing construction work after abandonment of contract by contractors, *held* not entitled to recover difference between contract price and actual cost' of completing work, where it abandoned specifications and did work in a manner not contemplated by contracts and in a manner vastly more costly.

7. **Damages ☞121—Federal Agent not entitled to recover, on expert evidence, difference between cost of finishing contract and contract price.**

Under provision in contract authorizing federal Agent to complete work after defendants breached contracts, *held* that, where he did not' follow specifications of contract in completing contract, he could not recover, on expert evidence, difference between cost of finishing contract as measured by expert evidence and contract price.

Appeal from District Court, Harris County; W. E. Monteith, Judge.

Action by James C. Davis, Agent for the United States Government, against the Massachusetts Bonding & Insurance Company and another. Judgment for plaintiff, and defendants appeal. Reversed and rendered.

Morris, Sewell & Morris, of Houston, and Burgess, Burgess, Sadler, Chrestman & Brundidge, of Dallas, for appellants.

Baker, Botts, Parker & Garwood, and Garrison & Watson, all of Houston, for appellee.

WALKER, J. We take the following statement of the nature and result· of this suit from appellants' brief; the contents of the exhibits referred to, as far as necessary to an understanding of .the issues being fully given.

"John Barton Payne (substituted by James C. Davis), Agent of United States government, herein styled plaintiff, filed this suit in the district court, Sixty-First judicial district of Texas, at Houston, September 15, 1920, against the defendants W. B. Drake and H. M. Brannum, composing the firm of Drake-Brannum Construction Company, herein styled contractors, as principals, and Massachusetts Bonding

& Insurance Company, herein styled surety, for the alleged breach of two construction contracts made by and between the United States government, which will herein be included in the term 'plaintiff,' and the contractors, and to recover against said contractors as principals and the said surety, as surety, upon two bonds; one given to secure the performance of each of said contracts, respectively.

"By original petition, plaintiff alleged that the contractors, by written contract dated September 30, 1918, with W. G. McAdoo, Director General of Railroads, agreed to do all of the grading, clearing, and grubbing required for the construction of a double track branch line of the Houston & Texas Central Railroad, in Dallas county, Tex., and complete the same a distance of 2.6 miles, according to provisions of said contract and specifications attached, marked Exhibit A, the work to be commenced within 10 and completed within 140 days from September 30, 1918; that the contractors did part of the work under said contract, but, prior to its completion, wholly abandoned the same and breached the contract; that plaintiff thereupon took over the work and completed the same at an excess cost, as shown by Exhibit B attached, 'aggregating the sum of $32,599.98'; that the said contractors, as principals, and said surety, as surety, to secure the performance of said contract, gave to plaintiff a bond, dated October 4, 1918, in the principal sum of $6,000, a copy of which is attached marked Exhibit C; that plaintiff's damages exceeded the amount of said bond, by reasons whereof plaintiff is entitled to judgment for the full amount thereof; that by like contract, of same date, between same parties, contractors agreed to complete and do all of the grading, clearing, and grubbing, required for the construction of a single track branch of railroad of Houston & Texas Central Railroad in Dallas county, a distance of about 3.2 miles, according to copy of said contract and specifications attached, marked Exhibit D, the work to be commenced within 10 and completed within 140 days from September 30, 1918; that the contractors did part of the work, but, prior to its completion, wholly abandoned same and breached the contract; that plaintiff then took over the work, and completed the same, as shown by exhibit E attached, at a cost, in excess of the contract price, 'aggregating the sum of $28,425.44'; that the contractors, as principals, and said surety, as surety, to secure the performance of said contract, gave to plaintiff a bond, dated October 4, 1918, in the principal sum of $6,000, a copy of which bond is attached, marked Exhibit F; that plaintiff's damages under said second contract exceeded the amount of said second bond, by reason whereof plaintiff was entitled to judgment for the full amount thereof. By reason of all of which allegations plaintiff prayed judgment against contractors and surety for the aggregates of the amounts stated against each.

"By second amended original answer, filed November 20, 1923, the surety interposed to plaintiff's petition a general demurrer and six special exceptions, general denial, and several special defenses. By like answer, filed the same date, the contractors interposed to plaintiff's petition the same general demurrer, special exceptions, general denial, and special answers, as were interposed by the surety. The court over- ruled both of said general demurrers and all of said special exceptions, to which contractors and surety excepted.

"The cause was tried before a jury, December 6, 1923, and at the conclusion of the evidence, before argument, the contractors and surety requested peremptory instructions in their favor, which were refused. The court then instructed the jury to return its verdict in favor of plaintiff, against the contractors, for $55,-350.57, and against the surety for $12,000, with interest on each of said sums from September 1, 1919, at 6 per cent. per annum; verdict was so returned and judgment was rendered accordingly, to which judgment, as well as the action of the court in overruling the contractors and surety's general demurrers and special exceptions to plaintiff's petition, they excepted."

Appellants also quote as follows from the contracts and bond: ·

"In the first contract: (1) Contractors agree that they will do and complete all the grading, clearing and grubbing required for the construction of a double track road bed 2.6 miles long, and place all 84-inch concrete pipe in the roadbed, remove all track material where necessary from old roadbed, in accordance with annexed specifications; all to be done under direction and to the satisfaction of plaintiff's engineer. (2) Contractor to furnish at his own expense sufficient teams, tools, and laborers and all other necessary things to complete the construction. (3) Work to begin within 10 days after dates of contract and be completed within 140 working days from date thereof. (11) For the work plaintiff agreed to pay contractors, for clearing, $25 per acre; for grubbing, $65 per acre; for all earth work, 25 cents per cubic yard; for placing 84-inch pipe, 85 cents per lineal foot; for dismantling track, 10 cents per lineal foot; anything not mentioned in the schedule of prices to be agreed upon.

"II. Payments to be made the 15th of each month for work done the preceding month, when certified by plaintiff's engineer to be in accordance with contract, less 10 per cent. to be held until final completion and acceptance of work and then paid, with any balance owing, upon the certificate of said engineer that the contract had been completed as specified.

"III. (1) Contractors to prosecute work with energy, and in workmanlike manner, with largest force of all classes of workmen that can be worked with advantage and expedition. That if during the work said engineer finds the force employed, the quantity and quality of the tools, appliances, or workmen provided, or material furnished, are not such as will insure completion of work within time stipulated, or not up to specifications, written notice will be given contractors 'to at once apply such increase of force, appliance, or tools,' and improve work or materials to make same conform with agreement and specifications, and if, at the end of 15 days, contractor shall have failed to furnish and remedy the deficiencies, 'the company may thereupon employ such labor at wages current in vicinity of work, and tools as it may deem necessary for the completion of the work "within the time stipulated," and deduct cost of same from payments then due or thereafter falling due to contractors'; time being of the essence of the agreement, and may be extended

to contractors even though they fail to complete work within time limited. (3) Contract provides for payment by plaintiff of certain debts of contractor, under .certain conditions, but same not involved herein, and further that unit prices named shall apply to all work of grubbing or grading done, etc., and for anything 'which cannot be measured or estimated under the terms of this contract' and specifications, said engineer shall fix the prices of same, with right in the contractors to perform or decline to perform such work at such prices, and in the latter case plaintiff may have it done otherwise, and, where contractors perform such extra work, their compensation shall be the prices fixed plus 10 per cent. (5) Plaintiff is given the right to change dimensions of the work, but height of fills or depth of cuts may not be increased more than 2 feet. (6) No claim for extra work allowed, unless done under written order from said engineer, and nothing shall be construed as extra which can be measured under the contract. (7) Relates to matters not involved. (8) Relieves plaintiff of certain character of damages, but provides that 'it understood and agreed that the contractors shall have such extension of time for the completion of the work embraced in this contract as shall be determined by the chief engineer as being equal to the time of delays caused by acts of the company or delays resulting from the failure on the part of the company to procure the right of way, or for any other reason not in control of the contractor,' provided contractor give said engineer notice in writing of the existence and cause of such hindrance, delay or detention within 48 hours after the time shall first occur. (9) Relieves plaintiff of certain liabilities of contractors, not involved. (10) Makes the decision of said engineer binding in all matters pertaining to the interpretation of the contract, and provides for arbitration in certain cases. Not involved. (11) Relates to subcontracts. Not involved. (12) Contractor agrees to execute and deliver to plaintiff a surety company bond in the sum of $6,000, 'for the faithful performance of this contract, and for the security of the company against all persons performing labor or furnishing materials, and against all persons claiming reparation on account of injuries in or upon the work hereinbefore specified, under and by virtue of this contract. (13) Not involved. (15) Not involved.

"Specifications: Only such portion of the specifications, part of first contract, as are deemed pertinent to this issue are here stated, in substance, or quoted. (10) 'Stumps must be grubbed entirely from all places where excavations occur, including grounds from which material is to be borrowed'; and (11) 'measurements of grubbing will be estimated upon all excavations or borrow pits where grubbing is actually done.' (12) The term 'grading' includes all excavations and embankments for the formation of the roadbed, ditches, etc. (13) All material classified as 'earth,' whether in cuts or fills. (17) 'The material for fills will be borrowed from the right of way.' (18) 'Borrow pits shall be continuous and connected with ditches, so they will drain to the nearest water course when required. Unless directed, material shall not be borrowed to a depth which will not permit the proper drainage.' (19) Side slopes of borrow pits on the right

of way shall be the same as used in the cross-section of the adjoining roadbed,' and providing for a 6-foot berme between embankment and edge of borrow pit and a 2-foot berme between outside slope of borrow and right of way line, and bermes must not be cut by scrapers or other tools. (20) 'Borrow pits must be taken out uniformly and as shallow as possible, consistent with economical handling and width of right of way.' (21) 'The existing track on the present grade, at option of contractors, is to be either raised vertically as grading work progresses, or track dismantled and removed from embankment, and piled in neat piles on the berme.' (22) All grading will be estimated and paid for by the cubic yard, based on actual measurements shown by the cross-section notes. (24) Overhaul.—If so directed by engineer, contractor will haul material for formation of roadbeds from the designated borrow pits on or along the right of way. Material hauled beyond the 300 feet free haul shall be paid for at the rate of 2 cents per cubic yard, per 100 feet.

"Bond: The bond given under first contract, after reciting the parties and the contract, states the obligation of the surety substantially as follows: That, if the contractors shall well and truly perform and fulfill each and all of the covenants, conditions, stipulations, and agreements, in said contract mentioned to be performed by contractors, and if contractors shall protect, save harmless, and indemnify plaintiff for any amount, they may be compelled to pay in settlement of any claims of whatsoever character, for which under the said contract the contractors would be liable, and shall pay plaintiff for supplies and labor which contractors may fail to furnish for completion of said work, and satisfy and discharge all forfeitures, liens, and claims of whatsoever character arising under said contract, and for which contractors would be liable, the obligation shall be void; otherwise remain in full force and effect.

"Second contract is in words and general tenor the same as the first contract, except that it calls for the construction of a single track railroad dump, and binds plaintiff to pay contractors for the work the following prices: For clearing, $25 per acre; for grubbing, $65 per acre; for embankment, 20 cents per cubic yard; for excavation, class A material, 95 cents per public yard, class B, 23 cents per cubic yard, and class C material 40 cents per cubic yard, and 2 cents per cubic yard for overhaul, as in first contract.

"Specifications to second contract are substantially the same, in essential particulars, as specifications to first contract, except that: (4) embankment shall be 17 feet wide and excavations 24 feet, including space for ditches. (18) 'Class A material shall comprise all rock lying in solid beds or masses in its original position and in stratas of more than 6 inches in thickness, which may be best removed by blasting, and boulders or detached rocks measuring one cubic yard or more.' (19) 'Class B material shall comprise all earth and other materials that can be displaced by a large size railway plow drawn by 6 good mules or horses of not less than 1,200 pounds in weight; plow and teams being manipulated by men experienced in this line of work.' (20) 'Class C material shall comprise all materials that do not

come under the classification of A or B material.' (21) 'All borrowed material to be class B.' (44) Grading shall be estimated and paid for by the cubic yard, at the prices specified for the respective materials. (45) The contract price per cubic yard shall include the excavation of the material by any method whatsoever, the loading, transportation, and deposit of the same in the manner prescribed by these specifications and in the places designated, and all other expenses incident to the work of grading. "The second bond, in its obligations, is substantially the same as the first bond."

Appellee alleged that the contractors began and did part of the work, but prior to its completion wholly abandoned it, thereby breaching the contracts, and that he took over the work and completed it. The following statement of the work done by the construction company and by the plaintiff was alleged:

Under first contract:

Statement of yardage handled by contractor, and by railroad company's forces in grading a new double track line 2.6 miles long in Dallas, Tex.

Work done by Drake-Brannum Co.:

| | |
|---|---|
| 18,682.89 cu. yds. embankment at 25c | $ 4,670 72 |
| 4,100 ft. track removed at 10c | 410 00 |
| | $ 5,080 72 |

Work done by company forces:

| | |
|---|---|
| 69,044.62 cu. yds. embankment; 1,700 cu. yds. extra embankment | 50,286 14 |
| Total cost of work January 31, 1920 | $55,366 86 |

Cost if contract had been carried out:

| | |
|---|---|
| 87,727.51 cu. yds. embankment at 25c | $21,931 88 |
| 1,700 cu. yds. extra excavation at 25c | 425 00 |
| 4,100 ft. track removed at 10c | 410 00 |
| | $22,766 88 |
| Excess cost of work | $32,599 98 |

Under second contract:

Statement showing yardage handled by Drake-Brannum Construction Company and by company forces in grading a single track line approximately 3.2 miles long near Dallas, Tex.

Work done by Drake-Brannum Co.:

| | |
|---|---|
| 43,906 cu. yds. embankment at 20c | $ 8,781 20 |
| 8,164 cu. yds. excavation at 23c | 1,877 72 |
| 33,040 cu. yds. overhaul 100' at 2c | 660 80 |
| 4.39 acres clearing at $25 | 109 75 |
| 2.09 acres grubbing at $65 | 135 85 |
| | $11,565 32 |

Work done by company forces:

74,116.45 cu. yds. embankment
1,983.58 cu. yds. excavation
672 cu. yds. extra excs.
196 cu. yds. extra emb.
21,600 cu. yds. overhaul 100'
1 acre clearing
.53 acre grubbing ......... $44,390 16

| | |
|---|---|
| Total cost of work January 31, 1920 | $44,955 48 |

Cost if contract had been carried out:

| | |
|---|---|
| 118,022.45 cu. yds. embankment at 20c | $23,604 49 |
| 10,147.58 cu. yds. excavation at 23c | 2,333 94 |
| 672 cu. yds. extra exca. at 23c | 154 56 |
| 196 cu. yds. extra emb. at 20c | 39 20 |
| 54,640 cu. yds. overhaul 100' at 2c | 1,092 80 |
| 5.39 acres clearing at $25 | 134 75 |
| 2.62 acres grubbing at $65 | 170 30 |
| | $27,530 04 |
| Excess cost of work | $28,425 44 |

After alleging in general terms his right to recover on the bonds, plaintiff further alleged, in substance, that he was compelled to complete the work, furnishing material and labor therefor, at an expense, charge, and cost greater than that provided in said contracts, setting out the excess cost, duly alleging the liability of the contractors for such excess; and, by reason of the default of the contractors, and breach of the obligations of the bonds, it was further alleged that the surety became liable and bound to pay the plaintiff the full amount of the principal of each of said bonds, aggregating $12,000.

Though plaintiff's petition showed the total charge and cost to him of completing the work, there was no allegation showing the many necessary items of expense under the terms of the contracts going to make up the total charges. There was no allegation as to the number, quantity, or character of the "teams, tools, and laborers" employed by plaintiff in completing the work, nor any of them, or the prices paid for same per day, week, or otherwise, so as to show the contractors and the surety the separate items making up the total. Though the contracts provided that, in the event the contractors made default, the plaintiff might "employ such labor at wages current in the vicinity of work, and tools as it may deem necessary for the completion of the work," there was no allegation that the wages paid were such as "current in the vicinity of work." There was no allegation that the results accomplished by plaintiff in completing the contracts were produced by the means and under the conditions named in the contracts. Again, though the contracts provide "the material for fills will be borrowed from the right of way," there were no allegations in plaintiff's petition that the material was taken from the right of way, nor was it alleged where the material was secured. Again, there was no allegation as to the kind or character of tools employed, the charges made, or the money paid for the same, or for the use thereof, nor was there any itemization of the means, material, or things that were used or went to produce the results for which the gross charges against appellants were made. These allegations were subject to the following special exceptions urged by appellants:

[1] (a) The petition was insufficient because it failed fully to set out an itemized statement item by item of all the work done by appellee in finishing the jobs or contracts out of which this litigation arose.

[2] (b) The allegations as to the total cost of completing the work were insufficient, in that they did not advise defendant of the many items that went in to make up the cost, nor was there any allegation as to how the work was done. It was the duty of the plaintiff, under appellants' special exceptions, to

specifically designate in detail the different items constituting the total cost against appellants. Defendants were entitled to have appellee's account itemized, so that they might be advised whether such work was necessary, and whether the charges were reasonable and proper, and whether the items charged against them would fall within the terms of the contract.

(c) Appellants' contracts provided compensation for the several items of work done and to be done. Appellee grouped his charges for this work. Under the special exceptions urged, it was his duty to itemize his statement, and to state separately the cost of each item.

[3] (d) The plaintiff's petition was fatally defective, because it failed to allege such facts as would show that the work was done according to the plans and specifications of the contracts under which appellants had agreed to do the work.

(e) The petition was further defective in that it did not show whether the work was done by day or in what manner it was done, with an itemization of the cost thereof. Defendants were entitled to this information in order that they might be advised as to the correctness of the charges made against them by plaintiff.

[4] (f) Again, plaintiff's petition was subject to special exception in failing to show the scale of wages paid for labor, or the utensils used in doing the work, or the manner of doing the work, or the reasonable market value of the material used, or the market price of the labor employed.

In Mims v. Mitchell, 1 Tex. 446, it was said:

"The object of pleading is to apprise the court and the opposite party of the facts on which the pleader intends to rely, as constituting his cause of action or grounds of defense. And the averments should set forth the facts relied on with such precision, clearness and certainty, as to apprise the opposite party of what he will be called upon to answer, and what is intended to be proved, so that the evidence introduced may not take him by surprise. Such certainty is essential in order that the facts relied on by either party may be understood by the party who is to answer them; by the jury who are to ascertain their truth, and by the court who is to give judgment upon them."

Again, in the cases of Prince v. Blisard (Tex. Civ. App.) 210 S. W. 301, and Negociacion Agricola y Ganadera de San Enrique, S. A. v. Love (Tex. Civ. App.) 220 S. W. 224, very similar general allegations were made with respect to plaintiffs' causes of action as are made in the instant case by plaintiff, and to which similar special exceptions, as in the instant case, were directed and overruled. In each of those cases the appellate courts held that the special exceptions should have been sustained. Certainly plaintiff's petition, in

the instant case, does not comply with the above rule, or with article 1827, Revised Civil Statutes, which requires that the petition shall contain "a full and clear statement of the cause of action."

As we understand the statement of the facts from the record, there were possibly only three conflicts in the evidence:

(a) Appellants said that they let plaintiff take over the completion of the contracts because plaintiff wanted them to work under impossible conditions, not provided in the contract, while appellee's witness testified that appellants quit because they could not meet their pay roll, and told plaintiffs to take over the work and complete it.

(b) Appellants testified that appellee refused them permission to use either a drag line on the right of way or to haul dirt in wagons from off the right of way, while plaintiff's witness testified that they consented to both those requests.

(c) Appellants testified that appellee's engineer agreed to finish the work by use of teams, scrapers, fresnoes, and wheelers, while the engineer testified for appellee denying any such agreement.

[5] Under these conflicts in the evidence, the trial court erred in instructing a verdict for appellee for any sum. If appellants did not breach the contract, but if appellee forced them to abandon the work because his agents required the work to be done under conditions not imposed by the contract, then appellants were not liable for the additional cost incurred by appellee. Again, if appellee's agents agreed to finish the work in accordance with the specifications, he had no cause of action against appellants, because it appears that the work was not done according to the specifications of the contracts.

Though the errors we have just discussed would require a reversal and remanding of this case, yet we believe, on the record, the trial court erred in refusing to instruct a verdict in appellants' favor.

Again quoting from their brief:

"Surety answered by general denial and several special pleas, in substance, as follows: That when the work was advertised to be let, and contractors bid thereon, it was with the specific understanding that all grading would be done, not with machinery of any kind, but with teams only; said provision being contained in forms furnished contractors by plaintiff on which to make their bids, and said bids constituted a part of the contracts sued on, and under terms thereof all work of grading was to be done by means aforesaid. That contractors did not abandon the contracts, but delivered same over to plaintiff with agreement that plaintiff would take over the contracts, and complete the work in accordance with plans and specifications, and the grading would be done with teams and not with machinery, and all rules of economy observed in finishing the work. That, whether said last-mentioned agreement was made or not, plaintiff was bound

to observe the terms of the original contracts, and finish the work in accordance with same, including the bids; notwithstanding which plaintiff breached every term in the contracts, and did the grading by the use of railroad trains, steam shovels, and other appliances, in violation of contracts and bids, and in violation of the verbal agreement at the time it took over the work; and, having breached said contracts, it is not entitled to recover. That plaintiff, at time of submission of plans and specifications for bids, by written specification required that contractors should bid on all grading work to be done with teams, scrapers, fresnoes, and wheelers, and any bid to do the work by another method must be plainly so marked. That contractors made their bids on basis that same should be done with teams, scrapers, fresnoes, and wheelers, and no machinery work contemplated. That plaintiff accepted said bids, and surety became bound on contractors' bonds on the basis that the contracts, plans, specifications, and the terms of the bids, should determine the method of performance by the contractors. That, while contractors were performing the work according to contracts, plans, specifications, and terms of the bids, all of which constituted one complete contract, weather conditions became such as to render impossible performance of the work by contractors according to the contracts, and regardless of those conditions, and the terms of the contracts, plaintiff refused to permit contractors to perform the work by any other method than that stipulated in the bids forming the basis of the contracts, and a part thereof. That contractors, being prevented from performance by excessive rains, overflows, and natural conditions over which they had no control, and though in the written contracts terms excusatory of delay under such circumstances were provided, plaintiff demanded immediate performance. That, after taking over the work, plaintiff did not pursue the methods contemplated under the contracts, but used different and more expensive methods, in that it used steam shovels for handling, and hauled material for building dumps by freight. That, by reason of said facts, plaintiff breached its contracts and relieved surety from liability. That, notwithstanding surety and contractor entered into the contracts under the circumstances stated in the preceding paragraph, and the work was taken over by plaintiff as therein stated, and in taking over same plaintiff specially contracted with contractors that it would perform the work as economically as possible under the terms of the contracts, and agreed to use teams, scrapers, fresnoes, and wheelers and not machinery, yet plaintiff breached the same in manner of performance by use of machinery, steam shovels, work trains, and other methods not known to surety; wherefore the surety should not be held to answer. That, under the terms and interpretation of the contracts sued on, contractors were not required to proceed in the performance of same at such times as weather conditions and matters over which they had no control should render it impracticable to do so. That, while contractors were doing the work, on account of excessive rain, wet weather, and overflows, and the peculiar condition of the terrain, being that of black, waxy river bottom land, it was impossible to perform contracts

as speedily as plaintiff demanded, the incompleted work being in river bottom land covered with water, and in such condition that neither men nor teams could work on plaintiff's right of ways, and with these conditions existing, in utter disregard of terms of contracts, which stipulated that plaintiff should give credit to contractors on time required for completion, for such days and times as weather conditions rendered work impracticable, plaintiff demanded that the work progress; contractors being unable to proceed with work by the use of means provided in the contracts, tendered performance of same by use of drag lines, wagons, and other means which they then could and would have used, and finished the work within time provided and within prices stipulated, but that plaintiff refused to permit any deviation by contractors, and insisted upon immediate performance according to the bids made. That hereupon contractors yielded to plaintiff completion of the contracts with the agreement that they should be performed economically by the means demanded of the contractors under terms of the bids and at stipulated prices for teams and labor. That, on taking over the contracts, plaintiff immediately breached the agreement with contractors, and breached the terms of the contract by using machinery, work trains, steam shovels and other methods, and rushing the work so as to render the cost of same largely in excess of what it would have cost contractors had they been permitted to pursue the terms of the contracts, and in violation of plaintiff's contract made with contractors at the time of taking over the work. That surety became surety in contemplation of the terms of the contracts, to be done according to the contracts, allowing for delays incident to weather conditions, etc., and, plaintiff having disregarded surety's rights, it should not be required to answer further. Contractors interposed the same defenses."

The contractor pleaded the same general defense.

The following facts appear on the record, without dispute:

(a) The work was let on written proposals stipulating that it should be done with "teams, scrapers, fresnoes, and wheelers," and the bids upon which the work was submitted were made on that condition. The proposals and bids were not formally made parts of the contracts, but, in construing the contracts under the authority given him therein, the chief engineer required that the work be done in the manner stipulated in the proposals and bids, and all bids dealt with the contracts as if the proposals and bids had been formally written therein.

(b) It began raining shortly after the work was started, and continued almost incessantly for a long time. The river overflowed its bottom where this work was being done, making it impossible to remove dirt for the fills from the right of way with "teams, scrapers, fresnoes, and wheelers."

(c) Under the provisions of the contracts, giving the contractors credit for delays not

under their control, the chief engineer gave them credit for certain of these rainy days.

(d) Notwithstanding the impossible condition of the weather and of the right of way where the contractors were required to work, the chief engineer insisted that the work be done with teams; scrapers, fresnoes, and wheelers; that more teams be placed on the work; that the contractors rush it to completion; and, notwithstanding the ground was so soft it would not support the weight of either man or mules, the engineer insisted that the work be pushed, or that the contractors proceed with the work. But, without further detailing the conditions under which the contractors surrendered the work, for the purpose of this discussion we will assume that they surrendered it under conditions constituting a breach of its covenants and obligations.

(e) After such breach, the chief engineer wrote the bonding company the following letter:

"March 22, 1919.

"Massachusetts Bonding & Insurance Company, Dallas, Texas—Gentlemen: I regret to have to inform you that Messrs. B. W. Drake and H. M. Brannum, who, on September 30, 1918, contracted to build a belt line at Dallas for the H. & T. C. R. R. and made bond in your company, have gotten so far behind with their work that it has been necessary for us to put on teams and laborers in order to secure the necessary progress. The contractors at present have practically no teams of their own or their subcontractors on the work. We hope to handle the work as economically as they could have done it themselves and trust that if they suffer any loss at all it will not be serious.

"Yours very truly."

Appellee then through his agents took charge of the work and tried to complete it "with teams, scrapers, fresnoes, and wheelers," but, finding that impossible, because of the weather conditions and the condition of the right of way, used dirt trains and steam shovels, bringing the dirt for the fills a distance of more than 2 miles.

(f) Neither the contractors nor the surety consented to this change in the specifications, nor were they consulted in relation thereto.

(g) The cost to appellee in the sum pleaded by him, and the actual cost to him above the contract price, was the sum for which the verdict was instructed by the trial court.

(h) But appellee offered no evidence whatever as to the cost of doing the work in accordance with the contracts and specifications. However, it appeared from his evidence that it could have been done cheaper under the specifications than in the way in which it was actually done. Under appellants' evidence it appeared that the work could have been done within the contract price.

(i) Appellee allowed appellants no credit for the overhaul, which, under the contracts, was to be 2 cents per cubic yard per 100 feet beyond the free haul limit of 300 feet, and, though a more costly method of construction was resorted to, no credit was allowed for the difference in the cost of the two methods of construction, and, though the contracts provided that the dirt for the fills should be taken from the right of way, no credit was allowed for the extra cost of moving it more than 2 miles.

(j) There was no evidence as to the different items entering into the cost of the construction of the work.

On our assumption that appellants breached their contracts, appellee had the right, under the terms of the contracts, to finish the work and to charge against appellants the excess in the cost above the contract price. But there was no provision in the contracts authorizing appellee to change the specifications at the expense of appellants, by adopting a more costly method of construction. There was no provision in the contracts authorizing him to refuse to take the dirt from the right of way, and to charge appellants with the cost of moving it more than 2 miles. If appellee desired protection under his contracts and bond, he was required by law to proceed to finish the work in accordance with the specifications upon which he had agreed, and his measure of damages would have been the excess in the cost of finishing the work in that manner above the contract price. Appellee seeks to justify his departure from the specifications on the ground that it was impossible to do the work in the manner called for, because of the impossible weather conditions. This contingency was provided for, since, by the express terms of the contracts, appellants were entitled to credit for all delays not caused by them. The chief engineer, representing appellee, construed this clause as giving appellants credit for certain of the rainy days. Thus it was the clear intent of the contracts that the time for the construction of the work should be extended from time to time so that the dirt could be taken from the right of way, thereby relieving the contractors of the expense of moving it from a greater distance. Therefore, in finishing the work, appellee rested under the duty to appellants to wait until the weather conditions improved, and then to proceed according to the specifications agreed upon.

[6] It is our judgment that, since appellee abandoned the specifications and did the work in a manner not contemplated by the contracts, and in a manner vastly more costly to appellants, there can be no recovery upon his petition.

In American Bonding Co. v. United States, 167 F. 910, 93 C. C. A. 310, the contractors breached their contract. Thereupon the government had the work finished under different specifications. The surety was relieved of liability. This is a valuable authority, in

that it reviews many of the decisons upon which the conclusion was reached.

City of Milwaukee v. Shailer, 84 F. 106, 28 C. C. A. 286, was a suit for damages for alleged breach of a contract for the construction of a tunnel. On the theory that the contract was breached, the city took over the work and completed the tunnel on a different line from that required of the contractor. On the question of liability, the court said:

"But it necessarily resulted that, when the work was taken out of the hands of the contractors, and the board of public works undertook to complete the tunnel, it was bound to proceed on the line of the agreement, and could not then change the line, and have the right to charge the contractors with the extra expense of construction. * * * If the original line was practicable, the board had its choice to finish the tunnel on that line and to look to the contractors for the expense in excess of the contract price, or to treat the contract as at an end and do with the work as it saw fit."

The contractors were relieved of liability.

United States v. Weisberger, 206 F. 641, 124 C. C. A. 429, was a suit on breach of contract. The government became dissatisfied with the manner in which the contractor was proceeding, and took over the work and performed it in a different manner. Following the case of American Bonding Co. v. United States, supra, the court held that the government was not entitled to recovery against the contractor and his surety, saying:

"The work so authorized to be taken over and completed, either by the government itself or by other parties employed by it, was manifestly the work specified in the contract, and not any substantially different work. * * * The law is, we think, well settled that where the government undertakes to take over work contracted to be done for it, for some breach of the provisions of the contract, and itself perform the work, or employ a third party to do so at the expense of the former contractor and his surety, the work so to be completed, in order to hold the contractor or his surety for the excess of cost, must be in substance the work that was contracted for, and must be performed without substantial departure from the contract."

For other cases, see United States v. U. S. F. & G. Co., 236 U. S. 512, 35 S. Ct. 298, 59 L. Ed. 696; Chesapeake Transit Co. v. Walker (C. C.) 158 F. 850; Chesapeake Transit Co. v. Mott, 169 F. 543, 95 C. C. A. 41; Fuller Co. v. Doyle et al. (C. C.) 87 F. 687; United States v. Freel, 186 U. S. 309, 22 S. Ct. 875, 46 L. Ed. 1177; Lonergan v. San Antonio Loan & Trust Co., 101 Tex. 63, 104 S. W. 1061, 106 S. W. 876, 22. L. R. A. (N. S.) 364, 129 Am. St. Rep. 803; Albright v. Allday (Tex. Civ. App.) 37 S. W. 646; Hines Clark v. Cummings, 84 Tex. 610, 19 S. W. 798; Lane & Saylor v. Scott & Culver, 57 Tex. 367; Durrell v. Farwell, 88 Tex. 98, 30 S. W. 539, 31 S. W. 185.

[7] The contracts provided that appellee should finish the work in the event appellants breached the contracts. This was a valuable right to both parties, since it removed the issue of damages from the field of speculation and the varying testimony of experts, and limited the recovery to the actual cost of actual construction. We think it clear, under this provision of the contract that appellee could not amend his petition and recover on expert evidence the difference between the cost of finishing the contract, as measured by expert evidence, and the contract price, even if he were to attempt to do so.

In American Surety Co. v. Woods, 105 F. 741, 45 C. C. A. 282, discussing a similar provision in a contract, it was said:

"The company is authorized to charge the expense of labor to the contractors. Such cost is to be paid out of the money due to the contractors or to become due by the contract. If the expense of doing the work was less than the sum that would be due and payable under the contract, the contractors were to receive the difference; and, if the expense was greater, the contractors should pay the amount of such excess. It is clear, therefore, that the parties to the contract anticipated that the contractors might not finish the work, and provided for the measure of damages on the completion of the work by the sewerage company at a cost greater than the contract price. * * * This provision of the contract cannot be ignored in deciding this question. The provision seems to have been made for the benefit of both parties. It gave to the sewerage company the right and power to take charge of the sewers and finish them on account of the delay or failure of the contractors. On the other hand, it secured to the contractors any sum that might be left of the unpaid contract price after the sewerage company had paid for the completed work. It also fixed and limited their liability for damages on account of their failure to finish the work, so far as this item of damages is concerned, to such excess as the sewerage company would have to pay over the contract price. This clause of the contract, conceding a different rule to prevail in its absence, rescued the case from the uncertain and speculative control of expert witnesses, and applied it to the practical test of actual cost. This secured to the contractors and their surety a valuable right. They should not be deprived of it. From the contract in this case, having due regard to section 19 of it, we do not think it can 'reasonably be supposed' that the parties contemplated that for a failure by the contractors to finish the work. they were to be held liable for any outlay which might be required to complete it, before the sewerage company was at any expense on that account."

For the reasons indicated, the judgment of the trial court is reversed, and judgment is here rendered in favor of appellants.